**GAS APPLIANCE MANUFACTURERS ASSOCIATION, INC., et al.,**
Plaintiffs,

v.

**DEPARTMENT OF ENERGY,**
Defendant.

Civ. A. No. 90–2824.

United States District Court,
District of Columbia.

Sept. 11, 1991.

Robert A. Burka, David W. Brown, Knopf & Burka, Washington, D.C., for plaintiffs.

Nathan Dodell, Thomas S. Rees, Asst. U.S. Attys., Washington, D.C., for defendant.

## MEMORANDUM

GESELL, District Judge.

This case returns to the Court after having been remanded to the defendant, Department of Energy ("DOE"), for further consideration in light of the Court's decision in Civil Action No. 89–1315 ("*GAMA I*"). *See Gas Appliance Manufacturers Association, Inc. v. Secretary of Energy*, 722 F.Supp. 792 (D.D.C.1989).

Plaintiffs in the current action, as in *GAMA I*, include the Gas Appliance Manufacturers Association ("GAMA")—a national trade association representing virtually all of the U.S. manufacturers of commercial and residential gas water heaters—as well as five members of GAMA that together account for over two-thirds of the commercial and residential storage water heaters sold in the U.S. Plaintiffs claim that the revised interim water heater standby loss requirements, which DOE has promulgated pursuant to 42 U.S.C. §§ 6831–40, *see* 55 Fed.Reg. 23841–81, are arbitrary, capricious, and impracticable. Plaintiffs therefore request that the Court vacate those requirements or, in the alternative, remand once again to DOE for still further proceedings. The issues are before the Court on cross-motions for summary judgment, which have been fully briefed and argued. The relevant material facts are not in dispute.

### I

The Energy Conservation Standards for New Buildings Act of 1976, 42 U.S.C. §§ 6831–40, requires the Department of Energy, in consultation with other government agencies and representatives from the building community and consumer groups, to develop and promulgate voluntary energy consumption standards. After analyzing proposed standards "in terms of energy efficiency, stimulation of use of nondepletable sources of energy, institutional resources, habitability, economic cost and benefit, and impact on affected groups," 42 U.S.C. § 6839, DOE is first to issue interim voluntary performance standards. Although the statute terms this first set of standards "interim," 42 U.S.C. § 6835 makes the interim standards binding on all federal building construction; the heads of federal agencies responsible for the construction of federal buildings are required to assure that "any Federal building meets or exceeds the applicable interim performance standards...." 42 U.S.C. § 6835. At the same time, DOE and other federal agencies must work to "facilitate the implementation of such standards by State and local governments." 42 U.S.C. § 6839. For nonfederal buildings, the voluntary performance standards are to be "developed solely as guidelines." 42 U.S.C. § 6833(a)(4).

During the twelve-month period after promulgation of the interim standards, DOE is further directed by statute to "conduct a demonstration project utilizing such standards in at least two geographical areas in different climatic regions of the country." 42 U.S.C. § 6833(a)(1), (2). Based on those demonstration projects, DOE must report to Congress its findings and conclusions in regard to the effect that the interim standards would have "on the design, construction costs, and the estimated total energy savings" of commercial and residential buildings. *Id.* Only then will final voluntary performance standards be promulgated. According to DOE, the demonstration projects required by the statute are already in progress. *See* Def. Memo. at 3.

### II

As described in *GAMA I*, DOE promulgated the interim standards required by statute in 1989. *See* 54 Fed.Reg. at 4538. The particular section of those standards at issue in both *GAMA I* and the present case set standby loss requirements for gas, oil, and electric commercial storage water heaters. Standby loss is the amount of heat that a water heater loses through its jacket, fittings, controls, and elsewhere, while the water heater is simply holding heated water without either further heating or dispensing it. The standby loss requirements propounded by the interim rule that was discussed in *GAMA I* were based in large part on standards developed by the

American Society of Heating, Refrigerating and Air–Conditioning Engineers, Inc. ("ASHRAE"). *See GAMA I,* 722 F.Supp. at 795.

GAMA contended in *GAMI I* that the standby loss requirements issued by DOE were not cost-efficient in that the amount of capital that would have to be expended to develop complying water heaters—if complying water heaters could be developed at all—would far outweigh any potential energy savings. Moreover, GAMA argued that DOE had acted arbitrarily and capriciously by failing to respond adequately to GAMA's comments and by providing insufficient justification on the record for its adoption of the ASHRAE standards as the interim rules. *See GAMA I,* 722 F.Supp. at 794.

After reviewing the record, this Court in *GAMA I* held that DOE had indeed failed to fulfill its obligations under the Administrative Procedure Act, 5 U.S.C. § 553, 701 *et seq,* and under the Energy Conservation Standards for New Buildings Act of 1976, 42 U.S.C. §§ 6831–40. As a result, the Court remanded the interim standby loss requirements for commercial storage water heaters to DOE and directed principally that DOE "provide a statement of reasons for adoption of standby loss criteria, with attention to the relevant statutory requirements, including those dealing with practicability, cost-benefit analysis, and impact on affected groups." *GAMA I,* 722 F.Supp. at 798.

Subsequent to the remand order, DOE on November 30, 1989, published a preliminary Statement of Reasons for Adoption of Standby Loss Criteria. *See* 54 Fed.Reg. 49724. The plaintiffs, among others, submitted comments and critiques relating to the Preliminary Statement, and on June 12, 1990, DOE published a revised final interim

rule that somewhat modified the standby loss requirements from what they had been before *GAMA I.*[1] *See* 55 Fed.Reg. at 23841–81. GAMA and the other plaintiffs have challenged the revised standby loss requirements on essentially the same grounds as they did the initial standby loss requirements in *GAMA I.*

### III

■ As in *GAMA I,* the Court has jurisdiction over this matter pursuant to the APA, 5 U.S.C. §§ 553, 701 *et seq.,* and can review the interim rule as a final agency action, regardless of whether the interim standard may differ from the final standard to be promulgated after the demonstration projects are completed. *See, e.g., Mid–Tex Electric Cooperative, Inc. v. FERC,* 822 F.2d 1123 (D.C.Cir.1987); *GAMA I,* 722 F.Supp. at 794 n. 1.[2]

■ DOE has also now raised the issue of standing. DOE contends that plaintiffs have not suffered any injury or shown that they will suffer a distinct and certain harm as the result of DOE's actions. As the Court found in *GAMA I,* however, the "potential injury to GAMA's member firms is substantial if the challenged rule is upheld." 722 F.Supp. at 794. At the least, plaintiffs will have to modify, or perhaps even overhaul, their manufacturing processes in order to conform to the new standards, which few if any of the plaintiffs will be able to satisfy with existing water heater models. Whether or not plaintiffs will be able to recoup their investments over time does not negate the fact that, for those firms competing for government business, additional expenditures will be required right away. Nor does the failure of the plaintiffs to specifically quantify these inevitable expenditures erase the threatened harm.

---

1. The revised final interim rule changed the maximum permissible standby loss for electric water heaters to 3.0 W/ft$^2$ from 1.9 W/ft$^2$, although the new standard made the tank and not the jacket the measuring surface (thus negating some of the apparent relaxation of the standard). The standby loss requirement for oil and gas water heaters remained unchanged at

(1.3 + 38/V)%, where V is the storage volume of the tank.

2. DOE seemed to challenge the court's jurisdiction over an interim rule in its initial memorandum, *see* DOE Memo. at 49–50, but then also seemed to deny that it had made such a challenge in its reply memorandum. *See* DOE Reply at 12 n. 10.

## IV

■ As the Court held in *GAMA I,* the proper standard of review in this case derives from the APA. Under the deferential standard of the APA, the Court must uphold DOE's action unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Although DOE must base its decision on a rational interpretation of the facts before it, the Court should not substitute its judgment for the Department's if the Department's decision is not manifestly contrary to the statute or unreasonable. *See Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 2781–83, 81 L.Ed.2d 694 (1984). Thus, despite the repeated requests that the Court appoint a special master—apparently on the theory that only a special master would have sufficient time and expertise to redo the work of the Department—the Court's proper role, in reviewing the decisions of DOE, is not to act itself as an agency; DOE is the relevant agency. The Court's purpose is only to ensure that the Department did not operate in violation of the APA and other applicable law.

Plaintiffs argue that the standards promulgated by DOE for standby loss in commercial storage water heaters are substantively unreasonable. In particular, plaintiffs assert that no existing model of water heater complies with DOE's new standards for electric, gas, or oil water heaters.[3] This fact alone, plaintiffs claim, is itself enough to invalidate DOE's standards, because the statute applicable to *residential* water heaters prohibits DOE from prescribing standards that would effectively eliminate an entire class of product from the United States. Arguing by analogy, plaintiffs claim that Congress implicitly must have intended to apply such a prohibition to commercial water heaters as well. In a similar vein, plaintiffs fault DOE for failing to provide any "path to compliance." Plaintiffs argue that without an exact idea of how to achieve compliance, DOE cannot show either that it is technologically feasible to make complying water heaters or that even if it is technologically possible, it is economically reasonable.

■ DOE correctly points out, however, that the Department does not need to limit its definition of what will be permissible under the standards to existing products. It is reasonably within the Department's discretion to require those members of the industry competing for government contracts to conform to technology that "has been conceived and is reasonably capable of experimental refinement within the standard's deadlines." *United Steelworkers of America, AFL–CIO–CLC v. Marshall,* 647 F.2d 1189, 1272 (D.C.Cir.1980), *cert. den.* 453 U.S. 913, 101 S.Ct. 3149, 69 L.Ed.2d 997 (1981). Moreover, the Department is not required to set out any specific path to compliance. On the contrary, the statute states explicitly that DOE may promulgate the voluntary performance standards "without specification of the methods, materials, and processes to be employed in achieving that goal or goals...." 42 U.S.C. § 6832(9).

■ Still, DOE is obligated to promulgate reasonable standards; and to do that, it must determine, first, that the technology exists to meet its standards, and second, that the implementation of that technology would be economically practicable. *See Steelworkers,* 647 F.2d at 1272; *American Iron and Steel Institute v. OSHA,* 939 F.2d 975, 979–80 (D.C.Cir.1991). As to the first prong of that two-prong test, plaintiffs do not make any argument directly on point; they never state, for example, that compliance would be impossible at any cost. Rather, they simply attack DOE's predictions and state that DOE has not itself produced a complying model. But

3. Despite this claim, plaintiffs elsewhere state that *"virtually* no current model" would satisfy the new standards, Pl. Memo. at 10 (emphasis added), and defendants point out that one plaintiff has indicated that it produces at least one complying water heater, Def. Reply at 5. Because, however, the existence or nonexistence of currently complying units is not relevant to the Court's holding, the possible dispute over this fact is not material for purposes of the summary judgment ruling.

under the deferential standard of review, the plaintiffs would need to do more for the Court to find the Department's standards technologically impossible. Based on the findings contained in the record—of ASHRAE, the National Institute of Standards and Technology ("NIST"), and DOE—the Department has met its burden under this first prong of the *Steelworkers* test by showing "that modern technology has at least conceived some industrial strategies or devices which are likely to be capable of meeting" the standards. *American Iron and Steel*, 939 F.2d at 980. For example, the Department indicated its conclusion, based on studies of current technology and predictive models, that electric storage water heaters "built with 2.75 to 3 inches of foam insulation surrounding the tank and R–8 fiberglass on the controls, or 6.5 inches inches of fiberglass surrounding the tank and controls, will meet the criteria." 55 Fed.Reg. at 23867. Similarly, the Department was able to identify certain improvements in gas water heater design that would, according to the studies and extrapolations, comply. *See* 55 Fed.Reg. at 23857–58. Because the evidence and reasoning that the Department employed in making such findings is documented on the record, the Court finds that DOE was not arbitrary or capricious in concluding that compliance with the interim regulations is technologically feasible.

■ The requirements under the second prong—the economic practicability prong—of the *Steelworkers* test are more complex, but the deference to be accorded the Department is nonetheless substantial: "A standard is economically feasible if the costs it imposes do not 'threaten massive dislocation to, or imperil the existence of, the industry.'" *American Iron and Steel,*

939 F.2d at 980 (quoting *Steelworkers,* 647 F.2d at 1265).

■ Under the particular statute at issue—as applied to commercial storage water heaters—no technologically possible standard would seem to violate this second prong. The standards that the Department has promulgated are binding only on the construction of federal buildings. Yet there has been no showing that federal construction comprises the bulk of, or even a substantial part of, total commercial storage water heater sales by the industry. In fact, plaintiffs seem more concerned about the possible adoption of the interim standards by states and localities, and about the money that will have to be spent by plaintiffs trying to persuade the states and localities *not* to adopt the standards. *See* Pl. Memo. at 13–14. Possible adoption by nonfederal entities, however, is not currently within the jurisdiction of this Court, even if it were ripe for judicial review. As a result, plaintiffs have not established that even the loss of the entire federal government as a customer would cause a meaningful enough dislocation of the industry to require the Court to remand or vacate the revised interim standards.[4] After all, if the standards truly are impracticable, as the plaintiffs contend, then the federal government will not be able to find any water heater suppliers for its new buildings, and DOE will be besieged by federal officials in charge of federal construction projects demanding that the standards be changed. In the mean time, plaintiffs will be able to continue selling to nonfederal purchasers.

## V

Based on the above analysis, the Court cannot find that the revised interim standards are substantively unreasonable. Plaintiffs, however, also claim that the pro-

---

**4.** The fact that the standards are only "interim" standards until after the demonstration projects are completed, when viewed in combination with the statutory command that the standards are to apply only to federal buildings, seems to indicate that Congress purposely picked a small segment of the industry as a test market, to determine whether the standards would indeed cause industry dislocation if they were mandated for nonfederal buildings as well. This con-

clusion is buttressed by the requirement that DOE provide to Congress, after the completion of the demonstration projects, "an analysis of the effect such standards would have on the design, construction costs ... to be realized from utilizing such energy standards in commercial buildings." 42 U.S.C. § 6833(1); *cf.* 42 U.S.C. § 6833(2) (requiring a similar analysis for residential buildings).

mulgation of the standards was procedurally defective.[5] In particular, they argue that DOE has failed to analyze the standards adequately "in terms of energy efficiency, ... economic cost and benefit, and impact upon affected groups." 42 U.S.C. § 6839. Some of these arguments are similar to those discussed above. For example, plaintiffs claim that DOE cannot have performed a reliable cost-benefit analysis, because DOE never obtained or produced a complying test model on which to base its evaluations. Furthermore, plaintiffs argue, the theorizing DOE did on hypothetical models was riddled with errors and false assumptions. Plaintiffs especially take issue with the computer model DOE employed to make many of its predictions. According to the plaintiffs, the computer results were so inaccurate that DOE had to add in a "fudge factor" to get everything to come out right. *See* Pl. Memo. at 38–40, 56–58.

■ As plaintiffs correctly point out, the Court needs only ascertain whether or not the Department's cost-benefit analysis was irrational when considered against the backdrop of the evidence that was or reasonably should have been before it, *see Steelworkers,* 647 F.2d at 1266; in other words, whether "the agency has developed substantial evidence" on which to base its conclusions. *Id.* Based on the record that DOE has compiled since the remand in *GAMA I,* the Court now finds that the Department has sufficiently complied with its procedural obligations.[6]

It is important to remember, in reviewing DOE's actions, that although the standards are final for purposes of judicial review, they are nonetheless only interim standards. Congress seems specifically to have contemplated that this initial set of standards would not be perfect. Thus, in drafting the statute, Congress required that the interim standards be adopted only in federal buildings. *See* 42 U.S.C. § 6835. Moreover, the legislators mandated that, *after* adoption of the interim standards, DOE perform demonstration projects to ascertain more exactly the costs and benefits of the standards. *See* 42 U.S.C. § 6833(1), (2). Following those projects, DOE is to report back to Congress, and only then are final standards to be promulgated. If Congress anticipated that DOE would be able to perform a complete cost-benefit analysis right away—which it presumably would have been able to do if complying models were already in significant use or readily available—then "interim" standards would not have been necessary. Although this statutory scheme does not give the Department license to act arbitrarily and capriciously, it does seem to envision special deference to DOE's interim set of standards. Congress expected that they would require further refinement.

When viewed in this light, DOE's actions (subsequent to the remand) were within the realm of reason. Based on tests performed by itself and others, the Department developed a computer program to model the effects of increased insulation on standby loss. Because, as plaintiffs point out, the standards proposed by DOE will exceed the performance capabilities of existing units, the method employed by DOE of extrapolating from existing data by means of a computer simulation was a reasonable way to attempt to predict costs and benefits. Based on its modeling, DOE was able to estimate the combination of tank and control insulation and other conservation devices such as intermittent ignition devices ("IIDs") and flue dampers that would achieve compliance. DOE was not itself required to produce a complying model, but was directed only to provide a reasonably

---

5. In their complaint, plaintiffs ask the Court to vacate the standards as substantively unreasonable, or to remand the standards on procedural grounds for further consideration by DOE. In their summary judgment motions, however, plaintiffs ask only for vacatur. *See* Pl. Memo. at 14 ("[W]e eschew any claim to procedural violations."). The Court's opinion makes either remedy inappropriate.

6. Plaintiffs seem to concede as much in their Memorandum. "The Court has now given defendant ample opportunity to cure the deficiencies in the record with further procedures...." Pl. Memo. at 14.

derived set of requirements. *See* 42 U.S.C. § 6832(9).

■ Plaintiffs properly raised objections during the rulemaking process to the Department's methodology. In the Court's view, DOE adequately responded to those objections. The Department was not obligated to convince plaintiffs that one testing method was superior to another; it was obligated only to consider and reasonably respond to plaintiff's comments. In *GAMA I*, the Court found that DOE's responses were "conclusory and vague and therefore insufficient to justify the rule." 722 F.Supp. at 796. Since the remand, however, DOE has shown on the record that it has given adequate consideration to the plaintiffs' comments. The Department does not have to be right; it must simply not be arbitrary, capricious, or irrational.

For example, one of the primary critiques plaintiffs made of the Department's methodology related to what the plaintiffs described as a "fudge factor," the amount of standby loss that DOE added in to its calculations and attributed to nonjacket heat losses. Plaintiffs claim that the Department never identified any way of insulating against such losses in electric water heaters, and miscalculated the amount of nonjacket losses in gas and oil water heaters. DOE asserts in response that it performed loss studies solely on the jacket first, in order to get an undistorted idea of the amount of loss attributable to the jacket alone, *see* 55 Fed.Reg. at 23873, and then, in calculating what modifications would lead to compliance, added in the fittings and controls losses as derived from certain named studies as well as NIST data. *See* 55 Fed.Reg. at 23853–54, 23857–58. The Department's reasoning process is on the record, as are its extensive responses to plaintiffs' comments. Regardless of whether that reasoning later proves to have been faulty in one way or another, it seems to the Court not to be arbitrary, capricious, or irrational.

■ Plaintiffs argue in a similar vein that a number of the aspects of the Depart-ment's evaluation of gas water heaters are fatally flawed. Plaintiffs assert, for example, that DOE's expectation that flue dampers and IIDs would be installed on low-input units is unreasonable, because the installation of those devices—which would be necessary in many cases to bring the low-input units into compliance—would be too expensive relative to the price of the units. In response, DOE points out that most of the higher output units are already equipped with IIDs and flue dampers, so the added cost for those units would be nonexistent. In regard to the lower input units, DOE concedes that some may simply not be able to be modified cost-effectively enough to be brought into compliance with the new standards. But as DOE correctly argues, a new standard is not unreasonable simply because certain product types will have to be discontinued. Under the *Steelworkers* test, the Department must demonstrate only that the costs of the new standards will "not threaten the existence or competitive structure of an entire industry, even if it does portend disaster for some marginal firms." 647 F.2d at 1272.

Throughout their briefs, plaintiffs assert that the Department has not quantified in enough detail the costs and benefits of the new standards. To a certain extent, DOE's estimates are often conjectural. But some speculation and prediction is inevitable when an agency is prescribing technology-forcing standards, particularly when, as here, the costs of compliance will likely be different for each individual manufacturer; indeed, it would be unreasonable to require the Department to come up with the exact retooling and modification expenses that each industry member can expect to bear in bringing its products into compliance. As the *Steelworkers* court recognized, "when the agency has proved technological feasibility by making reasonable predictions about experimental means of compliance, the court probably cannot expect hard and precise estimates of costs." 647 F.2d at 1266.[7] Under that standard, DOE has met

---

7. As was pointed out above, the fact that the standards DOE has promulgated are only inter-im standards, which will be more fully evaluated in terms of costs and benefits after federal

its burden of making reasonable cost-benefit estimates. For example, in determining the cost of complying electric and gas commercial water heaters, DOE began with the amount of increase that had been determined in the residential market, and then modified that number according to predicted differences for the commercial market. 55 Fed.Reg. at 23853, 23861. Despite plaintiffs' claim that the Department's method neglected certain factors, such as the difference in size between the commercial and domestic markets (which makes expenditure spreading more difficult in the former), the Department's prediction is a reasonable way of estimating the increased costs. DOE does not need to produce exact figures; it simply needs to be able to say, based on substantial evidence, that the costs will not dislocate the industry.

Plaintiffs have taken issue with a number of DOE's other assumptions and predictions as well,[8] apparently in a effort to demonstrate that the cumulative effect of the Department's errors is so significant that the cost-benefit analysis must be considered fundamentally unsound. But after a careful review of the record, the Court concludes that, as in the case of the factors discussed above, the Department has provided adequate on-the-record justification for its actions and sufficiently explained responses to plaintiffs' comments. As a result, the Court finds that its remand in *GAMA I* has been comlied with in all material respects, and thus declines either to remand again or to vacate the standby loss requirements at issue.

An appropriate Order accompanies this Memorandum.

### ORDER

Upon consideration of the cross-motions and the entire record herein and for the reasons stated in the accompanying Memorandum, it is hereby

ORDERED that defendant's motion for summary judgment is granted; and it is further

ORDERED that plaintiff's motion for summary judgment is denied.

---

buildings have begun to implement them and demonstration projects have been set up, seems to indicate that the Court owes particular deference to DOE in regard to its cost-benefit analysis.

**8.** Perhaps the only other issue worth noting is the plaintiffs' claim that the Department's definition for purposes of the standards of "instantaneous" water heaters, which are not covered by the promulgated standby loss requirements, expands the number of units that would be considered storage heaters without giving an adequate basis for doing so. Despite this claim, the record reflects the Department's rationale for revising the definition, and that rationale seems to the Court to be reasonable: the new definition will be easier to apply and will tend to include, rather than eliminate, heaters from the "storage" category covered by the new energy-conservation standards. *See* 55 Fed.Reg. 23864–65.