**NATURAL RESOURCES DEFENSE COUNCIL, INC., et al.,
Plaintiffs,**

v.

**William M. DALEY, in his official capacity as Secretary of the United States Department of Commerce, et al., Defendants.**

No. Civ.A. 99–0221(JLG).

United States District Court,
District of Columbia.

Aug. 11, 1999.

**104**

Stephen E. Roady, Monica B. Goldberg, Earth Justice Legal Defense Fund, Ocean Law Project, Washington, D.C., Renita Ford, Mark A. Brown, U.S. Department of Justice, Environment & Natural Resources Division, Washington, D.C.

### MEMORANDUM

JUNE L. GREEN, District Judge.

This matter is before the Court on cross-motions for summary judgment, pursuant to Fed.R.Civ.P. 56. Plaintiffs seek judicial review under the Magnuson–Stevens Fishery Conservation and Management Act ("FCMA"), 16 U.S.C. § 1855(f)(1)(B), and the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701–706, of a final rule issued by Defendants promulgating the 1999 fishing quota for the summer flounder. In addition, Plaintiffs and Defendants seek summary judgment on the issue of whether the environmental assessment pertaining to the 1999 fishing quota failed to comply with the requirements of the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321–4370(d). For the reasons that follow, the Court denies Plaintiffs' Motion for Summary Judgment and grants Defendants' Cross–Motion for Summary Judgment.

### BACKGROUND

This controversy arises from a rule issued by Defendants on December 31, 1998

(63 Fed.Reg. 72203 (1998)) that sets the 1999 summer flounder fishing quota, limiting the total amount of fish by weight that can be landed (brought to shore). The ruling was intended to comply with implementing regulations for the summer flounder Fishery Management Plan ("FMP")[1] which requires Defendant National Marine Fisheries Service ("NMFS") to establish certain fishing conservation measures for the upcoming year.

The summer flounder fishery of the Atlantic coast, managed jointly by the Atlantic States Marine Fisheries Commission and the Mid–Atlantic Fishery Management Council, developed a summer flounder FMP (approved by the NMFS) in consultation with the New England and South Atlantic Fisheries Management Councils. Pursuant to 50 C.F.R. § 648.100 and in response to amendments to the FMP adopted as a result of continued population declines, NMFS is required to implement measures for the fishing year to ensure that the target fishing mortality (F), as specified in the FMP, is not exceeded.

The target fishing mortality rate (F) is a statistic that expresses the depletion of the stock of fish attributable to fishermen (reduced by commercial and recreational harvesting), whether by capture or by discard of fatally wounded fish or otherwise, in a given year. See *Fishermen's Dock Cooperative, Inc. v. Brown*, 75 F.3d 164, 166 (4th Cir.1996). See generally 50 C.F.R. § 648.100(a) –(c) (1998) (providing more precise description of F). Its calculation is designed to maximize the harvest under prevailing ecological conditions on a sustainable basis. Therefore, F serves as a threshold index or biological reference point; a failure to achieve (exceeding) the target fishing mortality rate results in

---

1. The objectives of the FMP are to: (1) Reduce fishing mortality in the summer flounder fishery to assure that overfishing does not occur; (2) Reduce fishing mortality on immature summer flounder to increase spawning stock biomass; (3) Improve the yield from the fishery; (4) Promote compatible management regulations between State and Federal jurisdictions; (5) Promote uniform and effective enforcement of regulations; and (6) Minimize regulations to achieve the management objectives stated above. See Administrative Record ("A.R.") at 301–02. See also Supplement to the Administrative Record ("S.A.R.") Ex. 2(a) at 13.

overfishing and will detract from the FMP's mission to rebuild the stocks.[2] The 1999 target fishing mortality rate (F) for summer flounder was calculated to be 0.24 and thus required that any catch quota for 1999 be set at a level that would ensure that the actual F does not exceed 0.24.

In accordance with 50 C.F.R. § 648.100(c), NMFS is required to implement the fishing mortality rate (F) through annual quotas, which are specified in terms of the amount of summer flounder by weight that fishermen can bring to shore, also known as total allowable landings ("TAL"). The TAL quota must necessarily "assure that the applicable specified F will not be exceeded." 50 C.F.R. § 648.100(c). After proper notice and comment, NMFS finalized a rule that established the 1999 TAL quota for summer flounder to be 18.52 million pounds. *See* A.R. at 295, 708–09. This TAL quota was calculated to have an 18 percent chance of achieving (not exceeding) the specified target mortality rate (F) of 0.24.

The final rule also included a measure recommending the states implement an incidental catch[3] allocation plan intended to "improve the probability of achieving the target [mortality rate of 0.24]" and to "further reduce the overall mortality." A.R. at 709. There is no evidence in the record that suggests the incidental catch provision influenced or was a factor in the calculation of the 18 percent probability of achieving the target (F). The measure specified that the states allocate a portion of the commercial quota to incidental catch resources so that a coastwide incidental catch allocation of 32.7 percent of the total commercial TAL of 18.52 million pounds can be achieved. Although initially proposed as mandatory, NMFS has corrected the measure to be only voluntary by the states. *See id.* In addition, NMFS recog-

nizes that the extent to which a voluntary incidental catch allocation plan would enhance the probability of achieving the target (F) is unknown.

Finally, the NMFS was required to prepare an environmental assessment ("EA") to examine the short- and long-term environmental impacts on natural, social, and economic systems that would result from the implementation of the 1999 TAL quota. The EA is designed to determine the nature of the environmental impact from a proposed action and whether an environmental impact statement is required. 40 C.F.R. § 1501.4(b) & (c). Upon completion of the necessary analyses and consideration of the relevant factors and alternative management scenarios, the NMFS made a finding of "no significant impacts" from the 1999 TAL quota and concluded that preparation of an environmental impact statement was not required under section 102(2)(c) of NEPA.

## DISCUSSION

### *Summary Judgment Standard*

A motion for summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The Court must view the material presented in the light most favorable to the non-moving party, *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and resolve all doubts as to facts or the existence of facts against the moving party. *United States v. Diebold,* 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962). Here, the Administrative Record is sufficient for the Court to rule as a

---

**2.** *See* 50 C.F.R. § 600.310(d)(2)(i) (1998) ("Exceeding the fishing mortality threshold for a period of 1 year or more constitutes overfishing.").

**3.** Incidental catch is characterized as fish caught incidentally by fishers participating in a directed fishery of another species; therefore, summer flounder can be caught instead of or in addition to another targeted species.

matter of law on those facts that are not disputed.

### Standard and Scope of Judicial Review

■ The Court's review of Defendants' decision in a challenged agency action is not *de novo,* and must focus the inquiry on the administrative record already in existence. *See Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Pursuant to the APA, the Court may set aside an administrative decision if the decision was arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A) –(D). The FCMA explicitly imports the APA standard of review. 16 U.S.C. § 1855(f)(1)(B).

■ Under this standard, the Court must decide the threshold query of whether Congress has spoken directly to the precise question at issue: "If the intent of Congress is clear, that is the end of the matter." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). If the Court determines that Congress has not address the issue, it must then determine if the agency's construction of the relevant statute is permissible. *See id.* at 843, 104 S.Ct. 2778. To uphold the agency's interpretation, the Court need not find that the decision was the only permissible construction it could have adopted, or even the reading that the Court would have chosen; rather, the inquiry is "whether the Administrator's view . . . [was] a reasonable one." *Id.* at 843 n. 11, 845, 104 S.Ct. 2778. Moreover, the administrative agency's interpretation of the statute rendering the decision is entitled to considerable deference by the Court. *See id.* at 844, 104 S.Ct. 2778.

### The Magnuson–Stevens Fishery Conservation Management Act, the Fishery Management Plan, and Regulations Governing the National Marine Fisheries Service

Plaintiffs claim that the Defendants, in determining the 1999 TAL fishing quota for summer flounder, violated the express mandate of the FCMA, or more specifically, National Standard 1. The Court concludes, however, that as a matter of law, Defendants' decision was reasonable in light of the competing interests of the National Standards, and therefore, finds that Defendants are not in violation of FCMA's mandates, FMP, or NMFS regulations.

Section 1851 of the FCMA requires that "[a]ny fishery management plan . . . and any regulation promulgated to implement any such plan" be consistent with "national standards for fishery conservation and management. . . ." 16 U.S.C § 1851(a) (1985 & Supp.1999). Plaintiffs assert that Defendants violated National Standard 1 which states that "[c]onservation and management measures *shall prevent overfishing* while achieving, on a continuing basis, the optimum yield from each fishery for the United States fishing industry." *Id.* § 1851(a)(1) (emphasis added). In 1996, however, section 1851 was amended to include, *inter alia,* National Standard 8 which states:

> Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, *minimize adverse economic impacts* on such communities.

16 U.S.C. § 1851(a)(8) (Supp.1999) (emphasis added). It is evident that the policies of National Standards 1 and 8 are in competition. Yet, the FCMA mandates that NMFS fishery management measures be "consistent with" both National Standards 1 and 8 (in addition to the other National Standards). Therefore, a balance must be made so that both National Stan-

dards can be reconciled when provisions such as a TAL quota are implemented.

Applying the first prong of the *Chevron* analysis reveals that Congress provides no insight as to how National Standards 1 and 8 are to be reconciled when determining TAL fishing quotas. Nor is there any set formula or formal procedure expressed in the statute with which to calculate the factors of National Standards 1 and 8 in the regulations or fishery management plan. Finally, the FCMA does not mandate any particular level of certainty that must be attained for the TAL quota to be "consistent" with National Standard 1. Insofar as the statute is silent on this balancing issue, this Court must move to the second prong of the *Chevron* analysis to determine whether NMFS' decision is based on a permissible construction of the statute.

In deciding whether NMFS has permissibly construed the FCMA in making its 1999 TAL quota ruling, the analysis focuses on whether Defendants' interpretation of the statutory scheme was reasonable, based on the facts included in the administrative record. In this case, NMFS was required to consider both National Standard 1 and 8 in determining the 1999 TAL quota. Plaintiffs argue that the 18 percent probability of achieving the target fishing mortality rate (F) indicates that the TAL quota is virtually certain to cause overfishing and that the figure is "not in accordance with" FCMA National Standard 1.

■ Plaintiffs' argument is not persuasive. NMFS chose to compromise between the recommendation made by the Summer Flounder Monitoring Committee, which proposed a 14.97 million pounds TAL (having 50 percent probability of preventing overfishing) and the recommendation made by the Mid–Atlantic Fishery Management Council, which proposed a 20.20 million pounds TAL (having 3 percent chance of preventing overfishing). Pursuant to regulations, NMFS considered the recommendations, as well as public comments, and reasonably selected a TAL quota with a greater likelihood of preventing overfishing compared to that recommended by the Mid–Atlantic Fishery Management Council. *See* 63 Fed.Reg. 72203, 72204 (1998) (explaining that Council's recommendation was "unnecessarily risk prone" due to the low probability of 3 percent). NMFS also calculated a percent allocation (32.7 percent) of the total commercial TAL to be set aside for incidental catch of summer flounder. The purpose of the incidental catch allocation plan was to "improve the probability of achieving the target" and "reduce the overall mortality." 63 Fed.Reg. at 72204. In effect, the voluntary incidental catch allocation plan in conjunction with NMFS' rejection of a TAL quota having a 3 percent chance of achieving (F) was an effort to allow the TAL quota to be consistent with the mandate of National Standard 1.

Although facially it may appear to Plaintiffs that the TAL quota constitutes an unreasonably low probability of meeting National Standard 1, the Court recognizes the responsibility of NMFS in giving due consideration to National Standard 8 and the fact that neither the statute nor Congress explicitly quantifies the precise probability by which the TAL quota (or even a range of probabilities) should be deemed consistent with National Standard 1. Just as the Supreme Court was convinced in *Chevron*, this Court, too, is convinced that when an agency primarily responsible for administering legislation interprets the authorizing Congressional statute, the interpretation is not conducted in a "sterile textual vacuum, but in the context of implementing policy decisions in a technical and complex arena." *Id.* at 863, 104 S.Ct. 2778.

Congress has specifically delegated policy-making responsibilities to the executive departments to formulate political decisions that the courts are less qualified to make. *See id.* at 865, 104 S.Ct. 2778. Therefore, deference should be accorded to agencies whose task it is to resolve competing interests "which Congress itself

inadvertently did not resolve, or intentionally left to the resolved by the agency charged with the administration of the statute in light of everyday realities." *Id.* at 865–66, 104 S.Ct. 2778.

Finally, the parties agreed at the Motions Hearing on July 21, 1999, that the 1999 summer flounder fishing season has already proceeded more than half way to completion. As a practical matter, Plaintiffs' prayer for relief to revise the 1999 TAL quota cannot be implemented, given the fact that the TAL quota has already been in place for some time. As a consequence, although not a dispositive factor, this Court questions the feasibility of implementing a new TAL quota at this juncture.

In conclusion, Defendants fairly conceptualized the construction of the FCMA given the multitude of variables and interests. Therefore NMFS' 1999 TAL quota was in accordance with the statute and was arbitrary and capricious. In addition, for the same reasons presented, Defendants' action did not violate the FMP or NMFS' own regulations. Therefore, this Court denies Plaintiffs' Motion for Summary Judgment and grants Defendants' Motion for Summary Judgment on this issue.

### Voluntary Nature of the Incidental Catch Allocation Plan

Plaintiffs assert that Defendants' reliance on a "mandatory" incidental catch allocation plan in justifying the 1999 TAL quota was arbitrary and capricious because such a plan could only have been voluntary. Plaintiffs, however, have not met the burden of exposing evidence in the Administrative Record to support their assertion or contradict Defendants' contention that the analysis underlying both the proposed and final rules assumes the entire 18.52 million pounds TAL quota would be harvested. The allocation plan's intent was simply to provide further assurance that the fishing mortality rate would not be exceeded, independent and on top of the 18 percent probability of achieving the target fishing mortality rate (F). There-

fore, NMFS' change from a compliance criterion to voluntary status of the allocation plan had no influence on the agency's determination that the 1999 TAL quota would have an 18 percent chance of preventing overfishing. Simply because Defendants modified its position on an incidental catch program does not constitute "arbitrary and capricious" action.

Therefore, this Court finds that as a matter of law, Plaintiffs fail to show that Defendants' action was arbitrary and capricious. Accordingly, the Court grants Defendants' Motion for Summary Judgment on this issue.

### Adequacy of the Environmental Assessment

█ Plaintiffs claim that the environmental assessment or EA, prepared by Defendants, violated NEPA because it did not evaluate the final NMFS action. In addition, Plaintiffs assert that the EA failed to evaluate the long-term and cumulative effects of the 1999 TAL quota, ad therefore argue that the EA was fatally inadequate.

█ In reviewing environmental assessments, a court's "limited role" need only ensure that the decision of no significant impact was not "arbitrary, capricious, or an abuse of discretion" or otherwise irrational. *See Public Citizen v. National Highway Traffic Safety Admin.*, 848 F.2d 256, 266 (D.C.Cir.1988). In evaluating whether the EA's conclusion was arbitrary and capricious, the D.C. Circuit has employed a four-part test to scrutinize the agency's findings. First, the court must ascertain whether the agency: (1) took a "hard look" at the problem; (2) identified the relevant areas of environmental concern; (3) made a convincing case that the adverse impact on the environment was insignificant; and (4) established that changes in the project sufficiently reduced any impact of true significance (if any) to a minimum. *See Sierra Club v. Peterson*, 717 F.2d 1409, 1413 (D.C.Cir.1983) (citing *Cabinet Mountains Wilderness v. Peter-*

*son*, 685 F.2d 678, 681–82 (D.C.Cir.1982)). *See also Kleppe v. Sierra Club*, 427 U.S. 390, 410 n. 21, 96 S.Ct. 2718, 49 L.Ed.2d 576 (1976) (emphasizing that courts ensure that agencies take a "hard look" at the environmental consequences). Upon close examination of the EA, the Court finds that Defendants took the necessary "hard look" at the situation and have made a "convincing case that the impact [would be] insignificant." *Id.*

Without minimizing the importance of the EA, this Court cannot agree with Plaintiffs' focus on the EA's allegedly problematic evaluation of NMFS' final action. First, NMFS recognizes that the extent to which a voluntary incidental catch allocation plan would enhance the probability of achieving the target (F) is unknown. *See* A.R. at 324. Plaintiffs do not dispute this fact. In this respect, it would be highly speculative for NFMS to prepare any significantly conclusive findings based on such an elusive, unquantifiable impact. Second, Plaintiffs have not adequately shown, to the satisfaction of this Court, evidence that the formerly "mandatory" provisions of the incidental catch allocation plan was a factor in the original 18 percent probability determination. The record, as interpreted by Defendants, only discloses that the plan would independently increase the chances of meeting the target fishing mortality rate (F), on top of the pre-existing 18 percent probability that the target (F) would be achieved. At worst, a voluntary allocation plan implemented by none of the states will have no impact; the probability of achieving the target (F) will still be 18 percent. At best, a voluntary allocation plan implemented by at least one state would only increase the probability of achieving the target (F), although, as mentioned before, the precise extent of the impact is unpredictable.

This Court also finds that NMFS adequately analyzed the cumulative and long-term effects of the 1999 TAL quota. Section 5.0 of the EA evaluates the quotas and actual landings of past years and discusses the actual status of the summer flounder stocks as a direct result of the implemented quotas. *See* A.R. at 601. The EA's analysis found that as a result of the management measures from 1992 to 1996 compiled with landings and survey information from 1997, the stock size was increasing and the structure of the spawning size was expanding. Without detailing the entire analysis, the Court finds that the EA adequately satisfies the cumulative impact requirement.

The EA adequately evaluates the long-term impact of the 1999 TAL quota by the quota determination itself, coupled with the cumulative impact analysis discussed in section 5.0 of the EA. The TAL quota determination is a result of deliberations that took into account conservation measures and optimum yield on a continuing basis, as well as adverse economic impacts. The cumulative impact analysis presents past results of the management plan and reflect likely projections for stock assessment and future quotas. Taken together, both analyses reflect a long-term viability of the summer flounder stocks, and the Court finds the long-term impact requirement reasonably satisfied.

## CONCLUSION

Based on the Administrative Record, the 1999 TAL quota does not violate the FCMA, the FMP, or any relevant regulations. Rather than substitute its own opinion for the agency's experienced and informed final judgment, the Court finds that the NMFS reasonably construed FCMA's mandates in light of the competing interests involved and did not act arbitrarily or capriciously in making its final reasoned judgment. Additionally, the Court finds that the EA was adequate in its analysis of the 1999 TAL quota. Again, although not a dispositive factor, the Court considers the juncture at which this suit finds itself in the midst of the already commenced 1999 summer flounder fishing season. It is doubtful that any benefit would derive from a revised EA at this

time. Defendants' Motion for Summary Judgment is granted.

### *ORDER*

Upon consideration of Plaintiffs' Motion for Summary Judgment; Defendants' Cross–Motion for Summary Judgment; the oppositions, replies, and surreply thereto; the hearing held on July 21, 1999; the entire record in this case; and for the reasons stated in the attached memorandum of law, it is by the Court this 11th day of August 1999,

**ORDERED** that Plaintiffs' motion for summary judgment is **DENIED;** it is further

**ORDERED** that Defendants' cross-motion for summary judgment is **GRANTED;** and it is further