# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 19, 2007         Decided June 1, 2007

No. 05-5448

OCEANA, INC.,
APPELLANT

v.

CARLOS GUTIERREZ, IN HIS OFFICIAL CAPACITY AS
SECRETARY OF THE U.S. DEPARTMENT OF COMMERCE, ET AL.,
APPELLEES

Appeal from the United States District Court
for the District of Columbia
(No. 04cv01155)

*Eric A. Bilsky* argued the cause and filed the briefs for appellant. *James F. Simon* entered an appearance.

*Andrew Mergen*, Attorney, U.S. Department of Justice, argued the cause for appellees. With him on the brief was *John E. Arbab*, Attorney.

Before: GINSBURG, *Chief Judge*, and RANDOLPH and KAVANAUGH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* RANDOLPH.

RANDOLPH, *Circuit Judge*: Leatherback sea turtles are so named because of their unusual, rubber-like shell. They are found throughout the oceans of the world, in the Atlantic, Pacific, and Indian oceans, the Caribbean Sea, and the Gulf of Mexico. Leatherbacks are the largest living sea turtles; their front flippers can span nearly 9 feet, and they range in weight from 450 to 1,500 pounds. Since 1970, the Leatherback has been listed as an endangered species pursuant to the Endangered Species Act.

Pelagic – that is, open ocean – longline fishing poses a threat to leatherback turtles. This type of fishing in the Atlantic Ocean and the Gulf of Mexico, and specifically the adequacy of federal measures to reduce the threat to leatherbacks, is the focus of this appeal. Longline fishermen concentrate on swordfish and tuna. They determine where to fish by locating temperature fronts between cooler and warmer water masses. Fishing vessels deploy a monofilament line five to forty miles long across these fronts. The mainline is rigged with hooks baited with squid or mackerel and float configurations depending on the targeted species. If the intended catch is swordfish, the line is put out at dusk and retrieved at dawn; if the target is tuna, the line is put out at dawn and picked up at dusk.

Leatherback turtles typically feed on jellyfish and are not attracted to the bait on the longlines. But they are prone to getting entangled in the lines or becoming foul hooked. Entangled or hooked turtles can drown if they cannot surface to breathe. Turtles that disentangle themselves may retain gear such as hooks or line on their flippers or shoulders. This can cause them to die either from trauma or by impairing their swimming and foraging abilities. Between 1992 and 1999, United States longline fishermen in the Atlantic Ocean – who account for only five to eight percent of the hooks fished

there[1] – caught an estimated 6,363 leatherbacks. By one estimate there are only 27,600 nesting female leatherbacks in the Atlantic basin.

The Endangered Species Act directs the Secretary of Commerce and the Secretary of the Interior to determine whether a species is endangered or threatened. 16 U.S.C. § 1533(a)(1). Once a species is so designated, each federal agency must ensure that "any action authorized, funded, or carried out" by the agency is not "likely to jeopardize the continued existence" of the species. *Id*. § 1536(a)(2). The federal agency first determines whether any action "may affect listed species," 50 C.F.R. § 402.14(a), and, if it may, the agency initiates a formal consultation with either the Fish and Wildlife Service or the National Marine Fisheries Service, depending on the species.

During formal consultation, the Service – here the National Marine Fisheries Service[2] – produces a "biological opinion" describing how the proposed action will affect the species, 16 U.S.C. § 1536(b)(3)(A), and a statement concerning incidental

---

[1] The Service's regulations are not binding on international vessels operating on the high seas and therefore do not apply to the vast majority of pelagic longline fishing in the Atlantic Ocean. *See Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 154 n.11 (D.D.C. 2005).

[2] The action agency is the Highly Migratory Species Management Division of the National Marine Fisheries Service's Office of Sustainable Fishery. The Service's Southeast Regional Office is the expert, or consulting, agency. *See Ocean Conservancy*, 394 F. Supp. 2d at 154 n.12.

"take" of the species, 50 C.F.R. § 402.14(g)(7).[3] The biological opinion contains a determination regarding whether the proposed action is likely to jeopardize the continued existence of an endangered or threatened species, *id*. § 402.14(g)(4), and, if the Service finds a likelihood of jeopardy to the species, "reasonable and prudent alternatives" for the agency to implement in order to avoid the likelihood of jeopardy. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(3). A "reasonable and prudent alternative" – an RPA – is something "that can be implemented in a manner consistent with the intended purpose of the action, that can be implemented consistent with the scope of the Federal agency's legal authority and jurisdiction, that is economically and technologically feasible, and that the Director believes would avoid the likelihood of jeopardizing the continued existence of listed species." 50 C.F.R. § 402.02.

In its June 2001 biological opinion, the Fisheries Service determined that pelagic longline fishing in the Atlantic fishery was likely to jeopardize the continued existence of leatherback sea turtles. It therefore included an RPA to avoid jeopardy to leatherbacks while allowing longline fishermen to continue their operations. The RPA required the closure of the entire Northeast Distant section of the pelagic longline fishery, an area approximately due east of New Jersey. Longline vessels fishing in the remaining open areas were also required to carry dipnets and line-cutters to minimize entanglement and post-release mortality of sea turtle bycatch.

---

[3] "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. § 1532(19). The "take" therefore includes not only the turtles that are killed, but also those that are hooked or entangled and then let go.

The 2001 biological opinion also stated that the Fisheries Service would conduct a cooperative research program to develop, modify, and test gear technologies and fishing strategies to "(1) reduce the likelihood of interactions between fishing gear and sea turtles and (2) dramatically reduce immediate and delayed mortality rates of turtles captured in the fisheries." The research lasted for three seasons, and took place aboard commercial longline vessels working in the Northeast Distant under a scientific research permit. The studies evaluated the effectiveness of various fishing gear and techniques in reducing both the sea turtle bycatch and the mortality rate of sea turtles captured in the fishery and released alive.

The Northeast Distant experiment led the Fisheries Service to draw several conclusions. The Service found that vessels could significantly reduce loggerhead and leatherback bycatch by replacing the industry-wide standard J-hook with circle hooks.[4] Circle hooks reduce turtle bycatch by a range of fifty to ninety percent, depending on the type of hook, bait, and turtle involved. The gear removal procedures the experiment tested were also successful. The post-release mortality rate of leatherbacks was 13.1 percent, down from the 32.8 percent estimated for leatherbacks outside the experiment.

Upon completion of the experiment, the Fisheries Service planned to issue new regulations requiring gear modifications and to reopen longline fishing in the Northeast Distant. The proposed rule prohibited vessels from using J-hooks. The rule also included new requirements for gear removal and handling to reduce post-release mortality. The rule required that vessels carry line cutters and dipnets, that vessel operators have additional handling and release equipment, and that operators comply with additional guidelines regarding removal of gear.

---

[4] *See Ocean Conservancy*, 394 F. Supp. 2d at 153 n.8.

The regulations and reopening of the Northeast Distant would constitute "agency action," and the Endangered Species Act therefore again required consultation between different offices within the Fisheries Service. In early 2004, the Service began assembling a new biological opinion to assess the effects of reopening the Northeast Distant subject to the proposed regulations. The Service completed the opinion in June 2004 and, having concluded the action threatened the leatherback, produced a new RPA. The 2004 RPA consists of four elements: (1) a reduction in the post-release mortality rate of leatherbacks; (2) improvement of the monitoring of the effects of the fishery; (3) confirmation of the effectiveness of the hook and bait combinations; and (4) management action to avoid long-term elevations in leatherback takes or mortality.

The 2004 RPA is detailed and specific. The 2004 biological opinion first establishes a maximum incidental take level. Given this projected number of takes, the RPA then targets a level of post-release mortality that would result in a sufficiently low number of sea turtle deaths. The total number of turtles captured multiplied by the post-release mortality rate results in the "total estimated mortality," which is the estimated total number of turtles killed by the vessels under the regulatory authority of the Fisheries Service. The anticipated take for the 2004-2006 period was 1,981, or 805 leatherbacks in 2004 and 588 thereafter. That was an increase from the goal in the 2001 biological opinion of 438 per year, but a substantial decrease from the actual takes in 2001 (1,208) and 2002 (962). The anticipated three-year take starting in 2007 was 1,764, or 588 per year. The Service expected the post-release mortality rates to decline each year as fishing crews become better trained in gear removal. The biological opinion predicted mortality rates of 32.8 percent in 2004, 26.2 percent in 2005, and 19.6 percent in 2006. Beginning in 2007, the Service expects the post-release mortality rate to be 13.1 percent – the rate achieved in the

Northeast Distant experiment. Thus, the Service expects the 2004 RPA to bring down total estimated mortality of sea turtles from about 264 per year in 2004 to about 77 per year starting in 2007 and continuing indefinitely.

The 2004 RPA details how to implement the other elements as well. It requires the Fisheries Service to establish a comprehensive outreach program to ensure fishermen are "aware of the safe handling and gear removal requirements of the proposed action, understand how to use the required gear, and understand the importance of maximizing gear removal to maximizing post-release survival of sea turtles." The Service must develop and distribute training materials, hold training workshops, and establish a point of contact for the fishery. Training and certification is mandatory for vessel captains.

The Fisheries Service must increase observer coverage to at least eight percent. The 2004 RPA imposes deadlines on the submission of quarterly reports, and requires the Service to compile data throughout the year as vessels submit their logbooks. The RPA also requires the Service to review each annual and quarterly report as soon as it becomes available and reevaluate whether the fishery is likely to stay within the authorized take levels. If the reports indicate that this is unlikely, the Service "must take protective/corrective action to avoid long-term elevations in sea turtle takes and ensure that take levels . . . are not exceeded." This ongoing monitoring also applies to the post-release mortality rate: "If fleet-wide gear removal rates are not sufficient to meet the performance targets in [the RPA], [the Fisheries Service] must take immediate action to offset the increased mortality rates and bring overall anticipated mortality back down to the level specified in the first element of the RPA." This may involve closing large areas of the fishery.

Oceana repeats a claim the district judge, Leon, J., rejected in his thorough opinion. *See Ocean Conservancy v. Gutierrez*, 394 F. Supp. 2d 147, 164 (D.D.C. 2005). The claim is that the Fisheries Service acted arbitrarily when it predicted that the measures it was putting in place would result in a 13.1 percent mortality rate by 2007 for leatherbacks caught in longlines. The Northeast Distant experiment achieved this rate with well-trained crews. The RPA requires training to be available for all longline crews, but crew members are not required to enroll. Oceana sees other defects in the 2004 RPA: it lacks an enforcement mechanism and contains no positive incentives for compliance. The 2000 RPA had requirements similar to those in the 2004 RPA, but very few vessels complied because the requirements were never enforced. Oceana also argues the Service did not adequately account for "observer effect." The 2004 RPA requires only eight percent observer coverage, while in the experiment there were observers on every longline vessel.

As evidence of the Fisheries Service's unreasonable expectations, Oceana points to the Service's observation of vessels outside the Northeast Distant experiment that were unable to reach the 13.1 percent mortality rate. During the 2002-2003 fishing season, the Service observed twelve such vessels, ten of which had participated in the experiment. The resulting overall post-release mortality rate of leatherbacks was 31.9 percent – significantly higher than the 13.1 percent the Service expects vessels to attain beginning this year. Yet according to Oceana, the measures the Service is relying on to get to the 13.1 percent rate were "substantially present" during observation period.

The Fisheries Service disagrees with this evaluation. The twelve vessels observed during the 2002-2003, the Service notes, "were not subject to any of the requirements imposed on the experimental [Northeast Distant] vessels and included in the

2004 RPA." The vessels "were not required to remove gear to meet any specific mortality limits" because they were operating under the 2001 biological opinion, which "contained no express limits on mortality levels." The 2004 RPA also imposed, for the first time, the threat of large-scale fishery closure. The Fisheries Service thinks these aspects of the RPA are sufficient to replicate the 13.1 percent mortality rate it attained in the experiment.

The Service also disputes Oceana's assertion that there will be a wide disparity in performance between the eight percent of vessels the Service observes and the ninety-two percent it does not. As government counsel explained at oral argument, the Service's regulations require all vessels to keep logbooks that record every interaction with sea turtles. *Cf.* 50 C.F.R. § 648.7(b)(1)(I). Vessel captains give their logbooks to the Service, which compiles and analyzes the data. Having an observer on board helps ensure that a vessel will not falsify reports regarding interactions with sea turtles. But it does not follow that the lack of an observer will result in false reports. It is unlawful for any person to "[f]ail to comply in an accurate and timely fashion with the log report, reporting, record retention, inspection, and other requirements of [50 C.F.R.] § 648.7, or submit or maintain false information in records and reports required to be kept or filed under § 648.7." 50 C.F.R. § 648.14(a)(4). Captains and crewmembers can be fined up to $100,000 for each violation, *see* 16 U.S.C. § 1858(a), and may be criminally prosecuted, *see id.* § 1857(1)(A), (I); 18 U.S.C. § 1001; *accord United States v. Tomeny*, 144 F.3d 749, 756 (11th Cir. 1998). In light of these considerations, the Service believes it was justified in concluding that vessels would reach the 13.1 percent rate as planned in the RPA schedule.

Like the district court, we cannot find the Service's judgment is arbitrary or capricious. *See* 5 U.S.C. § 706(2)(A).

Oceana's objection is directed not at the RPA's goal of reducing the post-release mortality to 13.1 percent, but at the Service's determination that the goal could be achieved. That determination is a prediction resting on the agency's evaluation of past performance and its expert judgment about how the measures it implemented will operate in the future. Agencies, like legislators, make predictive judgments like this all the time. Sometimes the predictions are realized; sometimes they are not and adjustments must be made. So long as the agency's judgment is within the bounds of reason courts will uphold it, as the Supreme Court and this court have done in many analogous cases. *See, e.g.*, *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 594 (1981); *Time Warner Entm't Co. v. FCC*, 240 F.3d 1126, 1133 (D.C. Cir. 2001); *In re Core Commc'ns, Inc.*, 455 F.3d 267, 282 (D.C. Cir. 2006); *Village of Bensenville v. FAA*, 457 F.3d 52, 72 (D.C. Cir. 2006).

Oceana's reference to the twelve vessels the Fisheries Service observed outside the Northeast Distant experiment is effectively a claim that far from uncertainty over whether the 2004 RPA will reach its goal, there is concrete evidence that it will not. But this does not fully take into account the measures the Service expects will affect the vessels' practices. The Service believes the incentives and obligations in the RPA will change the behavior of the fishing crews. While it its true that the Service cannot guarantee this will occur, it is also true that Oceana cannot know that the RPA will fail.

In the event the Fisheries Service is wrong about the expected level of compliance, the RPA contains a backstop to ensure that its take and mortality levels of leatherbacks are not exceeded. The RPA requires ongoing monitoring, and adjustment in the event that anticipated take and mortality levels are not met. Section 8.1.4.2 of the RPA mandates that "[i]f fleet-wide gear removal rates are not sufficient to meet the

performance targets in [the RPA], [the Service] must take immediate action to offset the increased mortality rates and bring overall anticipated mortality back down to the level specified in the first element of the RPA." And since the RPA already includes hook and gear removal requirements, "the only remaining way to achieve further reductions in leatherback mortality in the pelagic longline fishery would be through closures that reduce fishing effort in areas of high leatherback bycatch."

For these reasons the judgment of the district court is affirmed.

*So ordered.*