# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued March 18, 2022          Decided June 7, 2022

No. 21-5120

OCEANA, INC.,
APPELLANT

v.

GINA RAIMONDO, IN HER OFFICIAL CAPACITY AS SECRETARY
OF COMMERCE, ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 1:17-cv-00829)

---

*Andrea A. Treece* was on the brief for appellant. With her on the briefs were *Stephen D. Mashuda* and *Brettny E. Hardy*.

*Ariel Mourrain*, Attorney, U.S. Department of Justice, argued the cause for appellees. On the brief were *Todd Kim*, Assistant Attorney General, and *Brian C. Toth* and *Michael T. Gray*, Attorneys.

Before: ROGERS and RAO, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge*

RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: This appeal from the judgment of the district court (Cooper, J.) presents issues regarding a federal agency's amendments to its fisheries management plan for tuna, swordfish and sharks that migrate along the Atlantic coast.

I.

Oceana, Inc., an organization dedicated to protecting oceans of the world, brought this action claiming that the agency's rulemaking failed to provide sufficient protection for the dusky shark (*Carcharhinus obscurus*). Oceana's standing is unchallenged and rests on affidavits from its members.

The federal agency is the National Marine Fisheries Service, an agency in the Department of Commerce. The Fisheries Service is responsible for administering the Fishery Conservation and Management Act of 1976, Pub. L. No. 94-265, 90 Stat. 331, commonly known as the Magnuson-Stevens Act. The Act is intended to "promote domestic commercial and recreational fishing under sound conservation and management principles," 16 U.S.C § 1801(b)(3), in the "exclusive economic zone" of the United States, *id.* § 1801(b)(1), an area extending 200 nautical miles seaward from each State's coastline, *see* Proclamation No. 5030, 48 Fed. Reg. 10,605 (Mar. 10, 1983). Within each coastal State's territorial sea, which generally extends three geographic miles from its coastline, the State has jurisdiction to regulate fishing. *See United States v. Maine*, 469 U.S. 504, 513 (1985).

There are eight regional Fishery Management Councils for the coastal fisheries in the Atlantic and Pacific. *See Anglers Conservation Network v. Pritzker*, 809 F.3d 664, 667 (D.C. Cir.

2016). With respect to "highly migratory species"[1] that travel across the Councils' regional boundaries in the Atlantic,[2] the Fisheries Service directly undertakes management of the fishery. 16 U.S.C. § 1852(a)(3).

The dusky shark is such a "highly migratory species." This shark inhabits temperate and tropical coastal seas throughout the world. Distinct dusky shark populations in the western Atlantic Ocean travel north in the spring as far as the coast of Massachusetts and then, in the fall, southward as far as the Gulf of Mexico and the Caribbean. Along the coast, these sharks are found in the surf and seaward as far as the Continental Shelf.

Dusky sharks may grow as large as twelve feet in length and weigh as much as 400 pounds. The "biology of this species . . . is characterized by very late age at first reproduction (~ 20 years), high longevity (> 40 years), and very limited reproductive potential, which result in low population growth rates and long generation times (30 years)." E. CORTÉS ET AL., STOCK ASSESSMENT OF DUSKY SHARK IN THE U.S. ATLANTIC AND GULF OF MEXICO 49 (2006). The shark bears small litters after a long gestation period, estimated to "be as long as 22–24 months."[3]

---

[1] The Act defines "highly migratory species" as "tuna species, marlin (Tetrapturus spp. and Makaira spp.), oceanic sharks, sailfishes (Istiophorus spp.), and swordfish (Xiphias gladius)." 16 U.S.C. § 1802(21).

[2] The boundaries, that is, of the following: the New England Council, Mid-Atlantic Council, South Atlantic Council, Gulf Council, and Caribbean Council. 16 U.S.C. § 1852(a)(3).

[3] Merry Camhi et al., *Dusky Shark*, *in* SHARKS, RAYS AND CHIMAERAS: THE STATUS OF THE CHONDRICHTHYAN FISHES 298 (Fowler et al. eds., 2005) (citation omitted).

To know this is to understand why commercial fishermen landing unlimited numbers of dusky sharks in the coastal Atlantic Ocean pose a threat to the species in that region. One might wonder why commercial fishermen would, as they had for decades, even bother to target dusky sharks. By all accounts shark meat is barely palatable. Fishermen nevertheless sought out this species to satisfy the demand for shark-fin soup. This is a Chinese dish, for centuries considered a delicacy,[4] selling at one time in fancy restaurants in California and elsewhere for as much as $100 a bowl, most of which consisted of chicken stock. It apparently did not matter that shark fins, like those of the dusky shark, have no taste and no nutritional benefit.

Overfishing of the dusky sharks in the Atlantic regions threatened the species. *See* Endangered and Threatened Wildlife and Plants; Notice of 12-Month Finding on Petitions to List the Northwest Atlantic Population of the Dusky Shark as Threatened or Endangered Under the Endangered Species Act (ESA), 79 Fed. Reg. 74,684, 74,688 (Dec. 16, 2014). Congress and the Fisheries Service, over the years, have taken actions that have protected the Atlantic dusky shark population. In 1993, the Fisheries Service banned "shark finning" in the Atlantic fishery. *See* Atlantic Highly Migratory Species (HMS) Fisheries; Fishery Management Plan (FMP), Plan Amendment, and Consolidation of Regulations, 64 Fed. Reg. 29,090, 29,108 (May 28, 1999); *see also* 50 C.F.R. § 678.21(a) (1993). Seven years later, Congress passed the Shark Finning Prohibition Act, Pub. L. No. 106-557, 114 Stat. 2772 (2000), which amended the Magnuson-Stevens Act to prohibit the removal of "any of the fins of a shark

---

[4] "The rapid expansion of the commercial shark fishery in the US in the late 1980s was fuelled in large part by the demand for shark fins in the markets of Asia. Duskies have one of the most sought after fins for shark fin soup because of their large size and high fin needle content (ceratotrichia) . . .." *Id.* at 299 (citations omitted).

(including the tail) at sea." 16 U.S.C. § 1857(1)(P)(i); *see also Chinatown Neighborhood Ass'n v. Harris*, 794 F.3d 1136, 1140 (9th Cir. 2015).[5]

In 1999, the Fisheries Service amended the Atlantic Fisheries Management Plan for highly migratory species to prohibit vessel operators from retaining dusky sharks. *See* 50 C.F.R. § 635.22(c) (2000); 50 C.F.R. pt. 635, app. A (2000); Amendments to the Fishery Management Plan for Atlantic Tunas, Swordfish, and Sharks and the Fishery Management Plan for Atlantic Billfish, 71 Fed. Reg. 58,058, 58,142 (Oct. 2, 2006); 64 Fed. Reg. at 29,108–09, 29,160. In other words, the annual catch limit for dusky sharks became zero. *See Oceana, Inc. v. Raimondo (Oceana II)*, 530 F. Supp. 3d 16, 19, 21 (D.D.C. 2021). The prohibition on vessel operators retaining, possessing, landing, selling, or purchasing dusky sharks remains in effect. 50 C.F.R. § 635.24(a)(5); 50 C.F.R. pt. 635, app. A (2016). In 2006, the Service took the added step of prohibiting fishing for and possessing sandbar sharks, "a doppelganger of the dusky whose targeting had resulted in sizable dusky shark bycatch." *Oceana II*, 530 F. Supp. 3d at 19. The Service adopted this measure because most dusky-shark bycatch was occurring in longline fishing, especially for sandbar sharks and

---

[5] No fewer than sixteen states and three territories impose some prohibition on shark finning or possession of shark fins. *See* Am. Samoa Code Ann. § 24.0961; Cal. Fish & Game Code §§ 2021, 2021.5, 7704(c); Del. Code Ann. tit. 7, § 928A; Fla. Stat. Ann. § 379.2426; 5 Guam Code Ann. § 63114.1; Haw. Rev. Stat. § 188-40.7; 515 Ill. Comp. Stat. § 5/5-30; La. Stat. Ann § 56:326(E); Md. Code Ann. Nat. Res. § 4-747; Mass. Gen. Laws Ann. ch. 130, § 106; Nev. Rev. Stat. Ann. § 597.905(1); N.M. Stat. Ann. §§ 17-10-2(A), 17-10-3(A); N.J. Stat. Ann. § 23:2B-23; N.Y. Env't. Conserv. Law § 13-0338; 2 N. Mar. I. Code § 5651; Or. Rev. Stat. Ann. § 509.160; 20 R.I. Gen. Laws Ann. § 20-1-29; Tex. Parks & Wild. Code Ann. § 66.2161; Wash. Rev. Code Ann. § 77.15.770.

other large coastal sharks.[6]

Also, in 2003, the Fisheries Service closed a large area in the mid-Atlantic off the coast of North Carolina to bottom longline fishing from January 1st through July 31st of each year "in part, because of high bycatch and mortality rates of dusky sharks on bottom longline gear in that area." Appellee Br. 9 (citing Atlantic Highly Migratory Species; Atlantic Shark Management Measures, 68 Fed. Reg. 74,746, 74,760–63 (Dec. 24, 2003)).

Even so, pelagic (open ocean) longline fishing[7] and bottom longline fishing[8] continued to pose a threat to the dusky shark. This type of fishing in the Atlantic and adjacent regions concentrates on tuna and swordfish. Fishermen determine where to fish by locating temperature fronts between cooler and warmer water masses. Vessels deploy lines five to forty miles long across these fronts. The mainline is rigged with gangions—leaders attached to the main line—containing baited hooks. If the intended catch is swordfish, the line will usually

---

[6] The Act defines "bycatch" as "fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic discards and regulatory discards. Such term does not include fish released alive under a recreational catch and release fishery management program." 16 U.S.C. § 1802(2).

[7] "Pelagic longline means a longline that is suspended by floats in the water column and that is not fixed to or in contact with the ocean bottom." 50 C.F.R. § 635.2.

[8] "Bottom longline means a longline that is deployed with enough weights and/or anchors to maintain contact with the ocean bottom." *Id.*

be put out at dusk and retrieved at dawn;[9] if the target is tuna, the line will be put out at dawn and picked up at dusk.[10]  *See Oceana, Inc. v. Gutierrez (Oceana I)*, 488 F.3d 1020, 1021 (D.C. Cir. 2007).

Although dusky sharks can no longer be the target of longline fishermen, they remain a "bycatch."  Based on a 2016 updated stock assessment, the Fisheries Service found that dusky shark bycatch mortality had to be reduced by thirty-five percent of 2015 levels for the population to recover by 2107.  *See* Atlantic Highly Migratory Species; Atlantic Shark Management Measures; Final Amendment 5b, 82 Fed. Reg. 16,478, 16,479 (Apr. 4, 2017).  The 2016 study showed significant progress in reducing overfishing of dusky sharks.  Nonetheless, the study determined that a further twelve percent-median reduction in mortality from 2015 levels was needed to end overfishing.

In response, the Service amended its 2006 Fisheries Management Plan for Atlantic highly migratory species.  The amendments, collectively called Amendment 5b, reconfirmed the closure of the dusky-shark fishery and the annual catch limit of zero.  *Id.* at 16,484.  In addition, Amendment 5b added greater training and certification requirements for fishermen to

---

[9] Swordfish feed at night.  *See* Peter Ward et al., *A Fish Lost at Sea: The Effect of Soak Time on Pelagic Longline Catches,* 102 FISHERY BULL. 179, 179, 182 (2005).  Studies in the coastal Pacific Ocean found that a "soak time of 5 hours and 3500 hooks (if that were possible) would result in a total catch of about two swordfish."  *Id.* at 187.

[10] *Id.* at 182.

identify dusky sharks;[11] new protocols for releasing hooked sharks; a requirement to use circle hooks for bottom-longline fisheries; and communication protocols for fishermen to alert others to avoid areas where dusky sharks are encountered.[12] *Id.* at 16,479.

On circle hooks, "the point is turned perpendicularly back to the shank to form a generally circular, or oval, shape." 50 C.F.R. § 635.2. They are so designed to catch the lip of the fish and, unlike traditional J-hooks, circle hooks rarely result in gut-hooking. Circle hooks will therefore decrease post-release mortality as compared to J-hooks. *See* 82 Fed. Reg. at 16,479–80; *see also* J.A. 687.

Circle hooks had already been mandated for pelagic longline fishing in the Atlantic in order to protect leatherback sea turtles and facilitate their release when they became entangled in the lines and foul-hooked. *See Oceana I*, 488 F.3d at 1022–23. As a bycatch mitigation measure, Amendment 5b applied the same requirement to bottom longline fishing for tuna and swordfish.

---

[11] *See* 82 Fed. Reg. at 16,479, 16,488; *see also* J.A. 580, 594. Receiving the certification needed to retain non-prohibited sharks from recreational, vessel-based fishing will include taking a training course focused on "shark identification and regulation." 82 Fed. Reg. at 16,488; *see also* J.A. 580, 694.

[12] Under the regulations, vessels must relocate "at least one nautical mile away from the location" where a dusky shark is encountered. *Oceana II*, 530 F. Supp. 3d at 51; *see* 50 C.F.R. § 635.21(c)(6)(ii), (d)(2)(iii). This is typical for regulations regarding protected species. For instance, the Service requires vessels to move at least one nautical mile away from a location where sea turtles or smalltooth sawfish are caught. *See* 50 C.F.R. § 635.21(b)(3).

The hooks for pelagic and bottom landline fishing must be non-stainless steel and thus corrodible. This too is an important bycatch-mortality mitigation measure. Pursuant to Amendment 5b, each vessel must have on board dehooker devices so that dusky sharks (and other species) may be released while they are still in the water. If the devices fail, the crew member must free the shark by cutting the gangion—the leader attached to the main line—"so that less than three feet (91.4 cm) of line remains attached to the hook." 50 C.F.R. § 635.21(c)(6)(i). The shark will then swim away with a hook attached to its jaws and a short run of line. The hook will then corrode quickly in saltwater, thus "minimizing injuries to released sharks." J.A. 602.[13]

This brings us to the procedural setting of the case. District Judge Cooper issued two comprehensive opinions. In the first, "the Court questioned [the Fisheries Service's] exclusion of logbook data from its assessment of the magnitude of the dusky shark bycatch problem and found that these issues warranted remand." *Oceana II*, 530 F. Supp. 3d at 23.[14] On remand the Service explained why there was "no scientifically valid basis to extrapolate dusky shark bycatch data from logbooks and other sources to estimate the total amount of dusky shark bycatch." *Id.* at 24.

---

[13] Our discussion centers on the regulations applied to longline commercial fishermen. The Service also regulates gill-netting (50 C.F.R. § 635.21(g)) and recreational fishing. Rod-and-reel fishing for non-prohibited sharks, for example, may be done only with "non-offset, corrodible circle hooks," 50 C.F.R. § 635.22(c)(1), "except when fishing with flies or artificial lures." *Id.* § 635.21(f)(2). The same requirements apply to handline fishing. *Id.* § 635.21(k); *see also id.* § 635.22(c)(1).

[14] We have sustained the Service's reliance on logbooks in assessing bycatch. *See Oceana I*, 488 F.3d at 1024–25.

Oceana then renewed its challenge to Amendment 5b. The court found the Service's treatment of the data unproblematic. Judge Cooper also concluded that the Service did not violate the Magnuson-Stevens Act by failing to enact stricter regulations. *Id.* at 30–54.

## II.

Oceana describes its appeal as raising two issues.

### A.

Oceana's first issue is whether the Fisheries Service violated the Magnuson-Stevens Act "by failing to actually limit bycatch of the overfished dusky shark or hold fisheries accountable to any level of dusky shark bycatch, despite the fact that bycatch is the cause of dusky shark overfishing and the sole impediment to rebuilding the population?"

Oceana's arguments on this issue are muddled. For more than two decades, the "annual catch limit" for dusky sharks has been zero. In its opening brief, Oceana complained that the Fisheries Service violated section 1853(a)(15)[15] because it failed to include bycatch within the annual zero catch limit. In response, the Fisheries Service's brief pointed out that it did indeed include bycatch: "the annual catch limit of zero applies not just to landing, retention, possession, and sale of dusky sharks, but also to bycatch of dusky sharks resulting in

---

[15] Each fisheries management plan must "establish a mechanism for specifying annual catch limits in the plan (including a multiyear plan), implementing regulations, or annual specifications, at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." 16 U.S.C. § 1853(a)(15).

mortality."[16]  Appellee Br. 30; *see* 50 C.F.R. § 600.310(f)(1)(i).

In its reply brief, Oceana tried to recover from its error. Oceana's argument became that although the Service included bycatch mortality in the annual catch limit, this did not count. Why?  Because "[i]f bycatch mortality is always above zero, then the catch limit of zero does not act as a numerical limit on bycatch mortality."  In other words, if the speed limit is set at 60 m.p.h. and drivers exceed it, there really is no speed limit.

We sought clarification at oral argument.  Oceana's counsel conceded that under the Act "catch" includes bycatch mortality, but not other bycatch (*e.g.*, live dusky sharks that are released by dehooking or cutting the leader). *See* Oral Argument Recording, *Oceana, Inc. v. Raimondo*, No. 21-5120, at 1:50–2:22 (Mar. 18, 2022).

So we move on to the remainder of Oceana's first issue—namely, whether the Fisheries Service has implemented any accountability measures to enforce the zero catch limit for dusky sharks.

Oceana views the new protocols in Amendment 5b—such as the training and circle-hook requirements—not as "accountability" measures, but as "conservation and management"[17] measures under 16 U.S.C. § 1851(a). It suggests those measures cannot qualify as "accountability" measures because they may not succeed in holding fisherman to the zero

---

[16] *See* 50 C.F.R. § 600.310(f)(1)(i) ("Catch includes fish that are retained for any purpose, as well as mortality of fish that are discarded.").

[17] Oceana also cites 16 U.S.C. § 1853(a)(1), which calls for conservation-and-management measures.

catch limit. That is, the measures do not hold fisherman "accountable" to the limit. This argument makes the same error as Oceana's "limit" argument. Ticketing speeders is an accountability measure even though drivers sometimes speed. So too with the measures in Amendment 5b, including closure of the dusky-shark fishery—if fisherman are not permitted to fish for dusky sharks this will implement the zero catch limit. That at least is how the Fisheries Service views its actions. *See* 82 Fed. Reg. at 16,484. Further, Amendment 5b provides additional measures to "reduce dusky shark mortality" through "bycatch reduction." J.A. 701. These measures supplement the Fisheries Service's preexisting measures to curb the overfishing of dusky sharks by reducing bycatch. *See, e.g.*, J.A. 345.

It is important to keep in mind that the rules of the Fisheries Service under this Act are directed not at lawyers and bureaucrats, but at captains of fishing ships and their crews. Those subject to the rules would find it difficult to see a material difference in the ends sought by accountability measures and those sought by conservation-and-management measures. The Act's overall aim is to prevent overfishing. *See, e.g.*, 16 U.S.C. § 1801(a); 50 C.F.R. § 600.310(b)(2)(ii)–(iii). Sections 1851(a) and 1853(a)(15), for instance, each call for measures to help prevent overfishing. *Compare* 16 U.S.C. § 1851(a)(1), *with id.* § 1853(a)(15). Given this common goal, one would expect accountability measures and conservation-and-management measures to overlap. The training requirements, for example, could be both a management measure—seeking to limit bycatch—and an accountability measure—removing an excuse for thinking that a dusky shark is another species. In terms of preserving and enhancing the dusky shark population in the western Atlantic, nothing much—including the legality of Amendment 5b—turns on how one protective measure or another is pigeon-holed.

13

B.

Oceana's second issue is whether the Fisheries Service violated the Magnuson-Stevens Act "when it failed to establish a reasonable likelihood that training measures, communication protocols, and minor gear changes would reduce dusky shark bycatch by 35 percent, the minimum reduction needed to meet the statutory requirement to rebuild the population?"

Relying on *Natural Resources Defense Council, Inc. v. Daley*, 209 F.3d 747, 753–56 (D.C. Cir. 2000), Oceana argues that the Service had to show that Amendment 5b would result in at least a fifty percent chance that the Atlantic dusky shark population would rebound. In *Daley,* the Service set a harvest quota for summer flounder that appeared too high to prevent overfishing. *Id.*

*Daley* does not control here. The Service is not attempting to balance a catch quota with preventing overfishing. *See id.* at 754. Rather, the Service has closed the dusky-shark fishery and set the lowest possible number of allowable catches: zero. 82 Fed. Reg. at 16,484. In short, unlike in *Daley*, the Service here is not promoting an overly optimistic sustainability projection to justify a more liberal fishing quota.

Oceana also criticizes the studies and evaluations the Service relied upon in adopting its Amendment 5b protocols. In what is an all-too-familiar mode of appellate brief writing, Oceana wastes space plucking quotations from our court's opinions and stringing them together without analysis. Thus, Oceana reminds us, as if we needed reminding, that our court does not "rubber-stamp" agency action, that we do not "accept bare conclusory allegations as fact," and that we do not defer to "unsupported suppositions." Appellant Br. 49–50 (internal quotation marks omitted).

Oceana should be reassured, although assurances are not needed, that we have never used or even owned a rubber stamp, that we have never, ever considered an allegation alone to be a fact, and that we have never credited a "supposition" that was lacking in support. *See Oceana, Inc. v. Ross*, 920 F.3d 855, 863 (D.C. Cir. 2019).

As to the regulations regarding hooks, the Service relied on evidence supporting its conclusion that circle-hook usage will decrease dusky-shark mortality. The Service found that twenty-five percent of bottom longline vessels did not use circle hooks. Oceana cites a study finding no significant difference in mortality rates between the use of circle hooks and J-hooks to argue that the requirement will have no appreciable impact. *See* J.A. 464. But the Service cited multiple studies finding reduced at-vessel shark mortality when circle hooks were used instead of J-hooks. *See* 82 Fed. Reg. at 16,491; *see also* J.A. 376–77, 687. The Service's reliance on the cited studies, J.A. 599, its acknowledgment of contrary evidence, J.A. 687, and its stated reasons for reaching its conclusions, J.A. 599, 687, amount to decisionmaking based on reasoning having reliable evidentiary support. *See Shafer & Freeman Lakes Env't Conservation Corp. v. FERC*, 992 F.3d 1071, 1093 (D.C. Cir. 2021). No more is required.

Oceana also blames the Service for failing to show that Amendment 5b's new training requirements will be efficacious. The Service explained that the requirements should help recreational fishermen identify and properly handle caught dusky sharks. 82 Fed. Reg. at 16,488; J.A. 595. The Service recognized that it could not "quantify the total mortality reduction" that this particular measure would bring. J.A. 682. But the Service cited two studies in concluding that "education to fishermen can significantly improve compliance rates, reduce mistaken/illegal landings, [and] reduce post-release mortality

15

rates . . ..” *Id.* The Service therefore had solid grounds on which to conclude that the training-and-certification requirements would reduce dusky-shark mortality. *See Oceana I*, 488 F.3d at 1025.

*The judgment of the district court is affirmed.*